UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

KELLY L. MORAN KALAMAS,

    Plaintiff,

v.                                             CASE NO. 8:16-cv-563-T-26JSS

WILBUR ROSS, Secretary,
U.S. Department of Commerce,

    Defendant.
_____/

**O R D E R**

**BEFORE THE COURT** is Defendant's Motion for Summary Judgment (Dkt. 61), Statement of Undisputed Facts with exhibits (Dkt. 61-1), numerous depositions (Dkts. 63-74), Plaintiff's Response with Statement of Disputed Facts (Dkt. 78), depositions (Dkts. 79 and 79), and exhibits (Dkts. 81 and 86). After careful consideration of the parties' submissions, the applicable law, and the entire file, the Court concludes that the motion should be granted as to the retaliation claim and denied as to the discrimination claim.

**BACKGROUND**

Plaintiff Kelly L. Moran Kalamas is a current employee of Defendant. She alleges discrimination on the basis of sex under Title VII of the Civil Rights Act of 1964, 42

U.S.C. § 2000e, *et seq*., and retaliation under Title VII.[1] She claims that she was denied a "career ladder" promotion because she is a woman and that she was retaliated against because she complained to her supervisor's boss that her supervisor was discriminating against her on the basis of her sex. Plaintiff has correctly and graciously conceded that Defendant is entitled to summary judgment on the retaliation claim.

Since 1992, Plaintiff has worked for the National Marine Fisheries Service (NMFS) of the National Oceanic and Atmospheric Administration (NOAA) in the Office of Law Enforcement (OLE), Southeast Enforcement Division (SED) as a special agent. She recently, after the filing of this lawsuit, became a Criminal Investigator ZA-1811-IV (Band IV Special Agent).[2] She plans and conducts civil and criminal investigations of alleged or suspected violations of fish and wildlife laws and regulations under NOAA's jurisdiction.[3] In June 2012, when she filed a complaint of discrimination with NOAA, she held the position of Criminal Investigator ZA-1811-III (Band III Special Agent), which she held since February 1998.[4] After she submitted three applications from 2012 forward, she was finally promoted on the third try to Band IV level in April 2017.[5]

---

[1] See docket 39.

[2] See docket 61-2, page 14.

[3] See docket 61-2, page 15.

[4] See docket 61-2, page 14.

[5] See docket 63, page 187. Mr. Roberson and Ms. Casey also received promotions in 2017. See docket 63, page 188.

## **Opportunities for Promotion**

In August 2007, the Band IV Special Agent position was created through the United States Department of Commerce for NOAA OLE.[6] The first promotional opportunity for this new position arose in March 2008 at which time Plaintiff was told the application process would occur once a year thereafter.[7] With the option to apply every year in mind, she did not apply for the first offering.

In October 2008, the second opportunity for a promotion to Band IV Special Agent presented itself, but she was discouraged from applying by Assistant Special Agent in Charge (ASAC) Gregg Houghaboom, who was her first supervisor in the chain of command.[8] He told her that she should wait until the next cycle because she did not have the experience now required for the position.[9] Apparently the prerequisites for the position had changed since 2007. She was told by the Deputy Special Agent in Charge (DSAC) Tracy Dunn, the next level in the chain, that a "time-in-grade" requirement of at least ten years was required. She took the advice and did not apply in October 2008. At the end of the promotional period, however, she learned that a co-worker, SA Emanuel

---

[6] See docket 61-2, page 15.

[7] See docket 61-2, page 16.

[8] The ASAC reports to the Deputy Special Agent in Charge who reports to the Special Agent in Charge, which position is now called the Assistant Director.

[9] See docket 61-2, page 16.

Antonaras, was actively solicited for and received the position.[10]  He had just one year "time-in-grade" and had been a special agent for only five years.

The third promotional opportunity arose in September 2011.[11]  Seven men and Plaintiff applied for the promotion to Band IV Special Agent.  Four men received the promotion in January 2012.[12]  Although Plaintiff had complied with the requirements of 2008, she was not promoted because the qualifications for the job had changed, now requiring complex criminal investigations for a two to three-year span.[13]  After the positions were filled, she confirmed the additional requirements, which were not publicized prior to applying for the position, with ASAC Houghaboom.  She told him that 90 per cent of the then current Band IV Special Agents did not perform at those standards, and he agreed.[14]  Plaintiff realized that with each opportunity for a promotion

---

[10]  See docket 61-2, page 17.

[11]  See docket 61-2, page 17.  Apparently, in October 2011, the September 2011 opportunity was rescinded, new requirements were added, and the opportunity was reopened in December 2011.  See docket 61-2, page 19.

[12]  She was told by a co-worker in December 2011 that ASAC Paul Raymond and Acting DSAC Radonski had "made it their mission" to prevent her from getting a promotion.  See docket 61-2, page 19.

[13]  See docket 61-2, page 18.

[14]  See docket 61-2, page 18.

the bar was raised, seemingly for her only, with requirements added after the application process began and of which she had no notice.[15]

The fourth promotional opportunity occurred in 2016. Three men, three women, and Plaintiff applied for the position.[16] One woman and one man were selected. The man had prior EEO activity. A completely different panel of individuals were involved in the decision-making process in 2016 as opposed to 2012. The 2016 panel decided she still lacked complexity in her work and rejected her application.

Finally, on the fifth opportunity for promotion for Band IV in early 2017, ten years after the first promotion was offered, Plaintiff was selected. The 2016 and 2017 panel were almost identical with the exception of Assistant Director (AD) Giles, who retired and was replaced by Acting AD Antonaras.[17] Plaintiff challenges both the failure to promote in 2012 and in 2016.

**Plaintiff's Conduct of Employment**

During Plaintiff's lengthy tenure at NOAA, she reported to ASAC Harold Jeff Radonski from June 2006 until April 2008.[18] Since April 2008, she has been supervised

---

[15] See docket 61-2, pages 18-19. She believed the all-male panel consisted of DSAC Radonski, ASAC Paul Raymond, ASAC Mark Kinsey, and ASAC Houghaboom. See docket 61-2, page 19.

[16] See docket 61-1, paragraphs 93 and 94.

[17] See docket 61-1, paragraph 111. The Special Agent in Charge is now called the AD. See footnote 8 of this order.

[18] See docket 61-2, page 14.

by ASAC Houghaboom.[19] Beginning in the 1990's, rumors circulated accusing Plaintiff of having an extramarital affair with her co-worker, SA Charles Tyer.[20] In 2005, Plaintiff and SA Tyer confronted ASAC Paul Raymond about spreading the rumors.[21] Both Plaintiff and SA Tyer deny ever having an affair. The fall-out from the rumors resulted in a travel ban imposed on Plaintiff – she was not allowed to travel anywhere with SA Tyer as of April 2007.[22] She claims the ban, which still remains in effect, negatively affected her ability to qualify for the promotion to Band IV because she was denied numerous opportunities to participate in the broader civil and criminal investigations assigned to SA Tyer.[23]

In March 2008, her then supervisor ASAC Radonski removed her from the computer forensic team as a Seized Computer Evidence Recovery Specialist (SCERS), ostensibly to timely complete her case assignments.[24] She initially chose to participate on the team to expand the breadth of her civil and criminal law enforcement experience. Her

---

[19] See docket 61-2, page 14.

[20] See docket 61-1, paragraph 3 and docket 81, paragraph 6.

[21] See docket 81, paragraph 6.

[22] See docket 81, paragraph 7 and docket 81-1, pages 15-16.

[23] See docket 81, paragraph 8. ASAC Houghboom, however, testified at deposition that he was unaware of any travel restrictions because he was not her supervisor at the time. See docket 71, pages 41-43. At summary judgment, the Plaintiff's version is taken as true.

[24] See docket 81, paragraphs 1 and 2.

replacement on the SCERS team was SA Al Samuels, who had no computer forensic experience.[25] The agency paid for his training. Although she continuously asked to be reinstated to the SCERS team, she was denied membership for four years.[26] It was only after completing a masters in digital forensics and a nine-month process to become an International Association of Computer Investigative Specialists (IACIS) on her own time and money, was she finally reinstated to the SCERS team.[27] The agency generally paid for the IACIS training as it did for SA Tyer.[28] Plaintiff was the only female member of the SCERS team and the only member with a masters.

During the four years she was denied reentry to the SCERS team, she was also denied opportunities for training and to participate in civil and criminal investigations. According to Plaintiff, ASACs Radonski and Houghaboom denied her opportunities for training and limited her participation in "more complex" civil and criminal investigations throughout her career.[29] With respect to training, SA Antonaras was selected in August 2006 to attend Surveillance Operations Training, and Plaintiff was never advised about or offered the opportunity. SA Antonaras was selected two other times to attend training

---

[25] See docket 81, paragraph 3.

[26] See docket 81, paragraph 4.

[27] See docket 81, paragraph 5.

[28] See docket 81, paragraph 5.

[29] See docket 81, paragraph 11 and docket 81-1, pages 15-16.

when ASAC Radonski was her direct supervisor, and she was never advised about or offered the opportunity. When ASAC Houghaboom was her direct supervisor, SA Antonaras was selected on two separate occasions, again without Plaintiff being advised or offered the opportunity, to attend a leadership and special operations courses.

Plaintiff was never offered equivalent complicated case investigations and assignments as were her male counterparts.[30] Under the supervision of ASAC Houghaboom, SA Antonaras was assigned seventeen investigations and was selected to provide testimony to a grand jury for criminal investigations.[31] During this time, Plaintiff was told by ASAC Radonski to turn over all of her active investigations to SA Antonaras. Under both ASAC Radonski or ASAC Houghaboom, SA Antonaras was selected for several assignments such as the Individual Fisheries Quota (IFQ) Program Coordinator, Special Operations Coordinator, Panama Express Drug Task Force Representative, and International Whaling Conference Lead Coordinator.[32] Apart from her supervisors ASACs Radonski and Houghaboom, SA Antonaras led an effort to isolate and ostracize Plaintiff in the St. Petersburg office and did not share any information on the investigations he took over from her.[33]

---

[30] See docket 81, paragraph 11 and docket 70, pages 14-16.

[31] See docket 81, paragraph 11.

[32] See docket 81, paragraph 11.

[33] See docket 81, paragraph 12; docket 80, pages 8-10, 13-14, 19-23 and 25; docket 73, page 50; docket 64, pages 11, 61-66, 69 and 74; and docket 61-2, pages 175-

Although the flavor of Plaintiff's poor relationship with ASAC Rodonski cannot be succinctly captured, a few instances are very telling. In November 2007, then SA Antonaras convinced Plaintiff that she had permission to attend an Orlando work-related event with him.[34] When she returned from Orlando, ASAC Radonski told her she was lying about SA Antonaras' assurances. Afterwards, ASAC Radonski required her to make daily "call-ins" for months to inform him of her schedule.[35] He would often not answer her calls.[36]

With respect to the make-up of the 2012 promotion panel, Plaintiff had a history with four of the five members: ASAC Rodonski, ASAC Ronald Messa, ASAC Paul Raymond, ASAC Houghaboom. Apart from her just-described course of employment with her two supervisors, ASACs Radonski and Houghaboom, Plaintiff's career path also crossed with ASAC Messa and ASAC Raymond. ASAC Messa and ASAC Raymond both gossiped about the alleged affair with SA Tyer, and perpetuated the rumors. It was clear that ASAC Houghaboom showed favoritism toward SA Antonaras.

The main reason for denying her application in 2016 was lack of complexity in her cases, although she had always been denied more complex assignments based on her

---

181.

[34] See docket 81, paragraph 9.

[35] See docket 81, paragraph 10.

[36] See docket 81, paragraph 10 and docket 81-3.

supervisors' manipulation of case assignments. During Plaintiff's lengthy employment with the SED, there has only been one female supervisor.[37]

## DISCUSSION

### Summary Judgment Standard

Summary judgment is appropriate where there is no genuine dispute regarding any material fact. Fed.R.Civ.P. 56(a). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The court must view the record, and all its inferences, in the light most favorable to the nonmoving party, in this case the Plaintiff. See United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). Neither credibility determinations nor weighing the evidence may play any role in summary judgment proceedings. See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000); Anderson, 477 U.S. at 249, 106 S.Ct. at 2511. The court may not decide a genuine issue of fact at the summary judgment stage. See Fernandez v. Bankers Nat'l Life Ins. Co., 906 F.2d 559, 564 (11th Cir. 1990). Credibility decisions are best left for trial. See Anderson, 477 U.S. at 255, 106 S.Ct. at 1513-14. "The long and short of it is that the summary judgment rule applies in job discrimination cases just as in other cases.

---

[37] See docket 81, paragraph 14.

No thumb is to be placed on either side of the scale." Chapman v. AI Transport, 229 F.3d 1012, 1026 (11th Cir. 2000).

To establish a prima facie case of gender discrimination under Title VII based on circumstantial evidence, a plaintiff must show the following: (1) she is a member of a protected class (female); (2) she was qualified to perform the position she sought; (3) she suffered an adverse employment action, i.e., was denied the promotion; and (4) the employer awarded the position to a similarly-situated male. Maynard v. Board of Regents, 342 F.3d 1281, 1289 (11th Cir. 2003); Rice-Lamar v. City of Fort Lauderdale, 232 F.3d 836, 842-43 (11th Cir. 2000). Once this showing is made, the burden shifts to the employer to rebut the presumption of discrimination by producing admissible evidence "that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason." Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254-55, 101 S.Ct. 1089, 1094 (1981). If the prima facie case is rebutted, the plaintiff must then demonstrate that the proffered reason was pretextual – not the real reason for the employment decision. Burdine, 450 U.S. at 255, 101 S.Ct. at 1095.

The McDonnell Douglas[38] burden-shifting framework, as just espoused, applies only to single-motive, not mixed-motive, claims based on circumstantial evidence. Quigg v. Thomas Cnty. Sch. Dist., 814 F.3d 1227, 1237 (11th Cir. 2016). Single-motive and

---

[38] McDonnell Douglas v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

mixed-motive actually refer to different theories of discrimination, not claims for relief. Quigg, 814 F.3d at 1235 n.4. A single-motive claim requires a showing that bias was the sole, true reason for the adverse action. Quigg, 814 F.3d at 1235. A mixed-motive claim is one in which the employer acted in part on lawful reasons and in part on unlawful discriminatory reasons. Quigg, 814 F.3d at 1235. Under a mixed-motive claim, the more rigid McDonnell Douglas test does not apply. Quigg, 814 F.3d at 1238-39. Instead, the court must evaluate whether the plaintiff has produced sufficient evidence "for a reasonable jury to conclude, by a preponderance of the evidence, that [her protected characteristic] was a motivating factor for [an] adverse employment decision." Quigg, 814 F.3d at 1239 (alterations in original) (citation omitted) (internal quotation marks omitted). In mixed motive claims, the plaintiff need not prove pretext, but only that discrimination was one factor that motivated the adverse action. Quigg, 814 F.3d at 1240.

### Discrimination Claim

The parties agree that this case is based on circumstantial evidence. Plaintiff argues under either the single or mixed-motive standards, the evidence creates a genuine issue of material fact for the jury to decide. The Court finds the disputed facts as set forth above create a triable issue concerning the employer's discriminatory intent. The totality of the evidence suggests that there was no level playing field at the SED and that Plaintiff was targeted to not succeed, arguably based on gender bias. Viewing the submissions in the light most favorable to the Plaintiff, and taking them as true, she was treated very

differently than SA Antonaras through denial of training, the easier level of investigations she was given, and the absence of assignments that would have broadened her experience over the years. It is also questionable whether the seven factors to determine the quality of the application for consideration were applied subjectively and with gender in mind. The Court finds a genuine issue of material fact exists concerning the true reason she did not receive the promotion in 2012 and in 2016.

    Moreover, the Court is of the further opinion that this case presents a factual scenario which supports a reasonable belief that the better course would be to deny summary judgment and to proceed to trial on the merits. See Lind v. United Parcel Serv., Inc., 254 F.3d 1281, 1285 (11th Cir. 2001). Having expressed that opinion, however, Plaintiff should be well aware that the mere fact the Court has denied summary judgment does not mean that Defendant will not prevail following a motion for judgment as a matter of law submitted pursuant to Rule 50 of the Federal Rules of Civil Procedure. See, e.g., Abel v. Dubberly, 210 F. 3d 1334, 1337 (11th Cir. 2000) (observing that "[b]inding precedent in this Circuit, however, expressly permits consideration of a Rule 50 motion after the denial of summary judgment.") (footnote omitted) (and cases cited); see also Gleason v. Title Guarantee Co., 317 F.2d 56, 58 (5th Cir. 1963) (stating that "[s]ound

practical reasons . . . may justify a trial judge's denying summary judgment even on the identical evidence supporting his granting a directed verdict.").[39]

**ACCORDINGLY**, It is therefore **ORDERED AND ADJUDGED** that Defendant's Motion for Summary Judgment (Dkt. 61) is granted as to the retaliation claim and denied as to the discrimination claim. This case shall proceed to trial on the discrimination claim.

**DONE AND ORDERED** at Tampa, Florida, on December 12, 2017.

s/*Richard A. Lazzara*
**RICHARD A. LAZZARA**
**UNITED STATES DISTRICT JUDGE**

COPIES FURNISHED TO:
Counsel of Record

---

[39] In Bonner v. City of Prichard, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent the decisions of the former Fifth Circuit rendered prior to the close of business on September 30, 1981.